327 So.2d 355 (1975)
STATE of Louisiana
v.
Ronald SMITH.
No. 56410.
Supreme Court of Louisiana.
October 1, 1975.
Dissenting Opinion October 14, 1975.
On Rehearing February 23, 1976.
*356 Robert J. Zibilich, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
Defendant was tried and convicted of the murder of Steve Brubaker during a robbery which resulted in the death of two persons. The trial court sentenced defendant to life imprisonment without benefit of probation, pardon, parole, suspension or commutation of sentence for at least twenty years. It is settled that insofar as it conflicts with the Constitution by depriving the governor of his right to commute sentences (Art. 4, § 5, La.Const., 1974), such a penalty cannot stand. State v. Varice, 292 So.2d 703 (La.1974); State v. Ramsey, 292 So.2d 708 (La.1974).
Defendant raises three assignments of error to this court. We find it-necessary to discuss only two of these.
In his first assignment of error, defendant argues that the trial court committed reversible error by admitting into evidence a picture of the body of the victim taken at the morgue. The picture is a close up color photograph of the victim's head and shoulders, depicting large amounts of blood spread upon the victim's body as well as the area surrounding his head. The picture is grisly.
The test of admissibility is whether the probative value of the photograph outweighs its probable inflammatory effect. State v. Devore, 309 So.2d 325 (La.1975); State v. Chavers, 294 So.2d 489 (La.1974); State v. Curry, 292 So.2d 212 (La.1974). Further, to be admissible, the photograph must be relevant for some purpose. State v. Chavers, supra; State v. Curry, supra. This concept is a recognition that a balance must be struck between the probativity of the photograph and its tendency "to overwhelm reason and to associate the accused with the atrocity without sufficient evidence." 4 Wigmore, Evidence § 1157 (Chadbourn rev. 1972).
The photograph in the record before us does not depict the scene of the crime, as the trial judge's per curiam states. The upper portion of the victim's body and the bloody stretcher are the only objects identifiable in the picture. An assistant coroner later testified that the picture showed the body of the victim as he found it at the scene of the killing. A photographer testified he took the picture at the morgue.
Before this picture was admitted into evidence, the physician who had examined the victim at the scene testified that the victim had died of a gunshot wound to the head. Additionally, the physician who conducted the autopsy testified that the victim had died of a gunshot wound to the head, *357 and he was able to identify the bullet he had removed from the body of the victim. The picture was of little value in establishing the nature of the wounds or the cause of death.
Nor does the value of the picture in identifying the victim outweigh the gruesomeness of the picture; the investigating officer, who knew the victim, gave uncontradicted testimony that he recognized the dead body of the victim when he first arrived on the scene of the crime.
Under these circumstances we cannot agree that the probative value of this picture outweighs its prejudicial effect; in placing this photograph before the jury, the trial court abused his discretion.
This assignment of error has merit.
In his third assignment of error, defendant alleges that during the State's closing argument reference was made to defendant's failure to take the stand, in violation of the prohibition of C.Cr.P. 770. The comments of which defendant complains were made during the district attorney's effort to rebut several discrepancies raised by defense counsel:
". . . Well, I would assume that the gun was held at the top of the head. Wouldn't you logically conclude that if the bullet entered the top of the head? Who knows what went on in that cooler. Who knows what went on in this room besides the man who's seated right here and the two dead boys. Albert Lewis, as I said, can say what happened, but they can'tI don't know the position they were in in that cooler. One man does and that's the man who walked out of there with that gun. There were no fingerprints. Well, what are we supposed to do, manufacture fingerprints to say we found fingerprints? The police made a search for fingerprints and they didn't find any." (Emphasis added).
In arguing that this does not constitute a comment on defendant's failure to take the stand, the State relies on two cases decided by this court. State v. Howard, 262 La. 270, 263 So.2d 32 (1972) and State v. Clouatre, 262 La. 651, 264 So.2d 595 (1972). However, neither of these cases is applicable.
In State v. Howard this court upheld a conviction in which the district attorney, during closing argument, made reference to the defendant by saying "he has not seen fit to tell us." We were careful to point out that the remark was not a reference to defendant's failure to take the stand because it referred to a lengthy recorded confession during which defendant had not explained why he had shot the victim of the armed robbery:
"The trial judge found that the physical evidence introduced at the trial was on the rail of the jury box before the jury at the time of the closing argument, and that the prosecutor's reference was to a lengthy tape recorded confession, in which the accused admitted the crime, but gave no explanation for shooting the victim of the robbery." (263 So.2d 32, 34).
In State v. Clouatre a State witness, testifying in response to questions propounded by defense counsel, remarked, "No sir, no one could say definitely, except your client, sir." We clearly noted that whether or not the remark was a comment on defendant's failure to take the stand it was given by a witness in explanation to the question propounded by defense counsel:
"It is doubtful that the witness' remark can be said to be a comment on the failure of the accused to take the stand. We judge it is not. Moreover, the statement was made in response to a question by defense counsel on cross-examination. It was not a statement by `the judge, district attorney, or a court official.' And, although it is contended that the statement was gratuitous and uncalled for, it was in explanation of the answer to the question propounded by defense counsel.. . ." (264 So.2d 595, 603).
*358 Nor does the district attorney's remark in the case before us amount to a comment that the State's evidence is unrefuted. State v. Burch, 261 La. 3, 258 So.2d 851 (1972); State v. Reed, 284 So.2d 574 (La. 1973); State v. Baggett, 292 So.2d 201 (La.1974). At best, this expression is an indirect reference to the defendant's failure to testifythat he was the only person "who knows what went on in that cooler;" it focuses the jury's attention on defendant's silence by asking, "Who knows what went on in this room besides the man who's seated right here and the two dead boys."
We cannot allow such an infringement of the rule of our statutes and that laid down in Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."
We are aware of our decision in State v. Cryer, 262 La. 575, 263 So.2d 895 (1972), in which we held that it was not a comment on the defendants' failure to testify where, during closing argument, the district attorney pointed to defendants and asked: "Does anybody deny that these two people and Falcon were present that night in the Wooddale apartment? Does anybody attempt to refute this? No." To the extent that State v. Cryer, supra, is in conflict with this opinion, it is overruled.
The assignment is meritorious.
For these reasons the conviction and sentence are reversed and the case is remanded to the district court for a new trial in accordance with law.
SANDERS, C. J., dissents and assigns written reasons.
SUMMERS and MARCUS, JJ., dissent.
SANDERS, Chief Justice (dissenting).
The record reflects that on January 25, 1974, Ronald Smith committed an armed robbery of the Burger King, 2600 North Robertson Street, in New Orleans. During the course of the robbery, he shot and killed Frank Canzoneri, the manager, and Steve Brubaker, an employee; he seriously wounded Albert Lewis, another employee.
In the present case, the defendant was tried and convicted of the murder of Steve Brubaker. The majority reverses his conviction because a picture of the dead victim was introduced in evidence.
Of significance here is the familiar principle that when a defendant pleads not guilty, the State has the burden of proving every element of the crime beyond a reasonable doubt. LSA-C.Cr.P. Art. 804. This means that the evidence of guilt must be such as to convince the jury that there can be no doubt based upon reason. In the present case, this high standard of proof applied to the identity of the victim and to the cause of his death.
The photograph here was taken by the official photographer of the Coroner's Office after the body was brought to the morgue. It shows the upper portion of the body of a youthful white male on a stretcher, with smudges of dried blood on his head and on the sheet beneath. An identifying number appears in the picture. Although the picture is unpleasant, as are all pictures of death, there is nothing in the picture to shock the sensibilities of jurors, who are obviously aware that the case deals with murder. There is no dismemberment of the body; there is no exposure of the internal organs; there is no gaping wound. This Court has affirmed numerous convictions in which similar photographs, in some instances more gruesome, were admitted in evidence. See, e.g., State v. Gibson, La., 271 So.2d 868 (1973), photograph of a bloody head wound; State v. Hopper, 251 La. 77, 203 *359 So.2d 222 (1967), color photographs of the victim's injuries, including his internal organs; State v. Ford, 259 La. 1037, 254 So.2d 457 (1971), photograph of the body of victim with a gaping hole in chest; State v. Curry, La., 292 So.2d 212 (1974), photograph of the body of five-year-old boy torn by shotgun pellets fired at close range; State v. McMullan, 223 La. 629, 66 So.2d 574 (1953), color slides showing murder victim lying on bloodstained floor.
In upholding the admissibility of the photograph in State v. Curry, supra, we said:
"There can be no doubt that the photographs had substantial probative value in the present case. They were relevant to the identification of the victim, as the subject of the autopsy, and the cause of death."
The present photograph is admissible for the same reason as those in the above case. Two physicians examined the deceased. One of them, Dr. George Bailey, testified specifically that he could not identify the person whose body he examined. Tr. 85-86. The testimony of the other, Dr. Monroe Samuels, contains no indication that he was acquainted with the victim. Thus, the photograph had substantial probative value in establishing the identity of the subject of the autopsy and in corroborating the medical testimony that the victim died of a head wound.
It is true that the photograph does not show the point of bullet entry, but this does not render the photograph irrelevant. The concentration of blood on the head corroborates the medical testimony as to the cause of death.
During the past quarter century, this Court has dealt with hundreds of cases in which the photograph of the dead victim has been admitted in evidence. Insofar as I can determine, only one of them resulted in a reversal: State v. Morris, 245 La. 175, 157 So.2d 728 (1963). That case must be limited to its extreme facts, summarized as follows:
(1) The color photographs showed the body during the progress of the autopsy, including the open body cavity and internal organs. In some of them, the coroner was holding the organs.
(2) The colored photographs duplicated black and white photographs clearly showing the bullet wounds and had no real evidentiary value.
This Court was careful to point out:
"If the photographs had been limited to the area showing the points of entrance and possible egress of the bullets without showing the gruesome incisions incident to the autopsy, the action of the court in the admission of such cumulative evidence could not be held to be reversible error . . . ."
That case, of course, is distinguishable from the present one.
Finally, I must note with great concern that the evidence of guilt in the present case is overwhelming. In view of the nature of the evidence, it is difficult to understand how the majority can suggest that the photograph had a tendency "to overwhelm reason" and produce a guilty verdict without sufficient evidence.
A secondary holding of the majority is that reversal is required because the District Attorney commented on the failure of the defendant to take the stand and testify in his own behalf.
The statement complained of is in this context:
"Now, we are pointing out discrepancies, certain holes, certain funny things in the case and it's a little confusing as to . . . whether these things happened and so forth. Well, we are told that a bullet entered Steve Brubaker's head from the top and from the bottom and how is this possible. Well, I would *360 assume that the gun was held at the top of the head. Wouldn't you logically conclude that if the bullet entered the top of the head? Who knows what went on in that cooler. Who knows what went on in this room besides the man who's seated right here and the two dead boys. Albert Lewis, as I said, can say what happened, but they can'tI don't know the position they were in in that cooler. One man does and that's the man who walked out of there with that gun. There were no fingerprints. Well, what are we supposed to do, manufacture fingerprints to say we found fingerprints? The police made a search for fingerprints and they didn't find any. We heard talk about a white gun, or a white bag, rather, or a gray bag not being found. We heard talk about some discrepancies in the money, or what happened to the rest of this money. You know what this reminds me of, it reminds me perhaps of many, many people who write history."
The double killing occurred in a cold storage room. Only the killer and two victims were present. In the context of the above statement, the District Attorney is explaining why the minute details of the killing have not been shown but that defendant's commission of the crime is unrefuted by any evidence. (The defense offered no evidence.) Such a statement provides no basis for reversing the conviction. State v. Baggett, La., 292 So.2d 201 (1974); State v. Reed, La., 284 So.2d 574 (1973); State v. Cryer, 262 La. 575, 263 So.2d 895 (1972); State v. Burch, 261 La. 3, 258 So.2d 851 (1972).
In State v. Cryer, supra, this Court stated:
"In the jurisprudence, this Court has drawn a distinction between a statement that the State's evidence is uncontradicted and a prohibited comment upon the failure of the defendant to testify. The distinction has ample support in law and reason. Defense evidence is not restricted to defendant's own testimony. It may consist of the testimony of other witnesses and demonstrative evidence."
This Court cited the decision in State v. Cryer, supra, with approval in State v. Reed, La., 284 So.2d 574 (1973). I know of no adequate reason to overrule State v. Cryer, as the majority has done, since it follows a well-established principle of law.
For the reasons assigned, I respectfully dissent.

ON REHEARING
CALOGERO, Justice.
On application of the state we granted a rehearing in this matter to consider anew the alleged errors in the conduct of the trial which prompted us originally to reverse defendant's conviction and order the case retried.
Originally we found prejudicial error in two respects. We determined that the trial judge committed reversible error by admitting into evidence a photograph of the upper body of the victim Stephen Brubaker taken at the morgue. Additionally, we determined that the prosecutor, in his closing argument, made an indirect reference to defendant's failure to take the stand, requiring grant of a mistrial by virtue of Article 770 of the Code of Criminal Procedure.
Upon reconsideration we find neither asserted error meritorious; and, finding no merit in the sole remaining bill, (not considered originally) we reverse our earlier opinion and affirm defendant's conviction.
Defendant Ronald Smith was indicted for the first degree murder of Stephen Brubaker in the perpetration of an armed robbery. He was tried by jury and found guilty of second degree murder. The trial court sentenced defendant to life imprisonment without benefit of probation, pardon, parole, suspension or commutation *361 of sentence for at least twenty years. It is settled that, insofar as the sentence conflicts with the Constitution by depriving the governor of his right to pardon or commute sentences (Art. 4, § 5, La.Const., 1974), such a penalty cannot stand. State v. Varice, 292 So.2d 703 (La.1974); State v. Ramsey, 292 So.2d 708 (La.1974). Thus, although we affirm defendant's conviction, we must vacate his sentence and remand his case for re-sentencing in accordance with the foregoing.
The single color photograph at issue in assignment of error number one, the only photo taken at the morgue, was of the victim lying on a sheet. It was taken by the coroner's photographer. It showed the upper portion of the body of a youthful male with smudges of dried blood on his face, neck and upper chest and on the sheet beneath. It consisted of a profile of the victim's head, eyes closed, without any major wounds evident. The state used the photograph when asking the boy's father, John P. Brubaker, to identify his son, who was the victim of the murder.
The test of admissibility was properly set forth in our original opinion. That test is whether the probative value of the photograph outweighed its probable inflammatory effect. State v. Chavers, 294 So.2d 489 (La.1974); State v. Curry, 292 So.2d 212 (La.1974). The evidence of course must also be relevant for some purpose. And, as we indicated originally, a balance must be struck between the probativity of the photograph and its tendency "to overwhelm reason and to associate the accused with the atrocity without sufficient evidence." 4 Wigmore Evidence, § 1157 (Chadbourn rev. ed. 1972).
Consistent with this proper evidentiary rule, this Court found reversible error in State v. Morris, 245 La. 175, 157 So.2d 728 (1963). In that case, the color photographs used at trial showed a body during the process of an autopsy, including the opening of the body cavity and the internal organs. In some of the photographs, the detached organs were being held and exhibited. Furthermore, some of the color photographs duplicated black and white photographs already introduced in evidence. The photographs in Morris were indeed inadmissible. Morris, however, is distingishable from the present case, although we do not mean to say that only photographs taken during the progress of an autopsy, with open body cavity and internal organs exhibited, is inadmissible.
In the case at hand, the photograph was certainly unpleasant. It was not, however, especially gruesome. The only questionable element was the presence of blood in the color photograph. The picture as a whole, however, was not in our view so gruesome as to "overwhelm reason" and cause a jury to lose sight of the need for the prosecutor to establish with sufficient independent evidence the guilt of the accused. The jury had already been shown, without objection, two other distasteful photographs of the victim at the scene of the crime. (These photographs, one in color and one black and white, had been introduced to show the murder scene as it looked when it was discovered by investigating officers.) Additionally, of course, the jury knew that they were trying a murder case. The addition of this one objected-to color photograph did not add appreciably to the unpleasant depiction of this murder.
Furthermore, the photograph had distinct probative value. Inasmuch as the indictment charged defendant with the murder of one Stephen Brubaker, it was at least appropriate, and possibly necessary, for the state to establish that it was Stephen Brubaker who was the victim of this murder. It is not proper for us to conclude that the identification of Stephen Brubaker by his father was unnecessary because a police patrolman had already testified that he viewed the victim at the scene of the crime and recognized him as a young employee of the Burger King known to *362 him as "Steve." Under any conditions, the father's identification of the victim as his son Stephen Brubaker was "probative." Furthermore, it is inappropriate for us now to determine that the identification was or was not absolutely essential to the state's case. In any event we find that this identification was not merely cumulative.
When we balance the probative value of the photograph toward proving the identity of the murder victim, with the small likelihood that the jury was inflamed simply upon seeing this picture, we find that the probative value of the photograph outweighs its possible inflammatory effect. We realize that making this determination involves weighing two elusive concepts with an overall view not available to the trial judge. And the prosecutor would do well to avoid flirtation with reversible error. Nonetheless, we do not find that in this case the state committed error in using the photograph. Our judgment in this case, like that of the trial judge, is that this single photograph had sufficient probative value so as not to be outweighed by its possible inflammatory effect.
Relative to our second major concern on original hearing, we review anew a comment made by the district attorney in closing argument.
Article 770 of the Code of Criminal Procedure requires that a mistrial be ordered, upon motion of defendant, when a remark or comment made by the district attorney during trial or in argument refers directly or indirectly to ". . . (3) The failure of the defendant to testify in his own defense . . .."
In the case at hand, the trial judge refused to grant a mistrial upon a motion made by defendant's counsel at the conclusion of the district attorney's closing argument. The two statements here at issue are underscored in the following excerpt from the district attorney's argument.[1]
"Who knows what went on in this room besides the man who's seated right here and the two dead boys. Albert Lewis, as I said, can say what happened, but they can'tI don't know the position they were in in that cooler. One man does and that's the man who walked out of there with that gun."
The statement came in the midst of an argument of the district attorney having to do with certain details of the killing. (Specifically, the district attorney was discussing lack of specific proof as to where the gun was held in relation to the head of the victim when it was discharged.)
Very clearly, neither statement was a direct reference to defendant's failure to testify.[2] Instead, the question here is whether the comment was an indirect reference to the failure of the defendant to testify in his own defense. In order to mandate a mistrial we have said that the inference must be plain that the remark was intended to bring to the jury's attention the failure of the defendant to testify. State v. Reed, 284 So.2d 574 (La. 1973); State v. Howard, 262 La. 270, 263 So.2d 32 (1972).
As we review the district attorney's entire argument it becomes apparent to us that the two statements were not intended to call to the jury's attention the defendant's *363 failure to testify or failure to take the stand. The thrust of the argument was basically as follows:
We don't know some of the inconsequential specifics incident to the shooting inside the cooler because only the two dead boys and the defendant, whom we allege walked out of the cooler with that gun, were there.
Aside from the district attorney's intent, the words used simply do not focus upon the defendant's failure to take the stand. Furthermore, we do not read the words spoken as indicating that the district attorney had the intent to focus, however indirectly, upon defendant's failure to testify. His intent, as we determine it from the argument he presented to the jury, was to point up a problem in proving inconsequential specifics in light of the physical realities. And we conclude that the jury more than likely received the argument in that vein, rather than as one suggesting that they should conclude defendant was in the cooler or that defendant was guilty of the murder, because otherwise he would have taken the stand in his defense.
We do not deem it necessary to rely on decided cases to support our decision, nor to express agreement or disagreement with any of them. We note, however, that this position is not contrary to any of the reported decisions of this Court which we have been able to uncover. See State v. Hall, 297 So.2d 413 (La.1974); State v. Baggett, 292 So.2d 201 (La.1974); State v. Reed, 284 So.2d 574 (La.1973); State v. Clouatre, 262 La. 651, 264 So.2d 595 (1972); State v. Cryer, 262 La. 575, 263 So.2d 895 (1972); State v. Howard, 262 La. 270, 263 So.2d 32 (1972); State v. Isaac, 261 La. 487, 260 So.2d 302 (1972); State v. Burch, 261 La. 3, 258 So.2d 851 (1972).
A third specification of error, which we did not review in our original opinion because of our reversal upon the two asserted errors discussed hereinabove, was the trial court's overruling defendant's motion for a mistrial which defendant urged because of the state's failure to give proper notice of its intent to use an inculpatory statement at trial. The ruling arose during the testimony of John W. Ross, Sr., a friend of the defendant. Defendant had gone to the witness' house after the crime, and the witness began to relate what occurred there. The following colloquy occurred:
"Q. All right. Would you tell us what happened when he came to your house?
A. Well, when Ronald came he gave me some money, told me he wanted to stay there a while. I told him okay and then he say let's see. He told me, he say he wanted to stay. I said okay. So he gave me the money and I took the money and I put it in a plastic bag and I put it in my shed and he told me to keep it for him. I said okay. Well, he left then and I told him, I say, well, I'm going to the cleaners and I say my wife has to go to town and when I come back she can go. So I went to the cleaners and I came back and my wife left. Then Ronald came and he asked me for the money and I went and got the money.
Q. All right.
A. He asked meso we started counting the money. I started counting. I count about $400 in moneyand and that's when he told me, he say, `Well, let me count the money.' He say give me some envelopes. So I went and got the envelopes for him and I put, myself I put money in about three or four envelopes and that's when Ronald was telling me about the money came from Burger King.

*364 DEFENSE COUNSEL: I object to anything Ronald Smith might have told him. There's been no predicate laid for this."
After a discussion before the bench, defense counsel renewed his objection, this time arguing that no notice of its intent to use an inculpatory statement had been given him by the state. The state agreed to abandon this line of questioning. Defendant nonetheless persisted in his mistrial motion, which the court denied. The court then, on defendant's request, admonished the jury to disregard any testimony given by the witness as to any remarks allegedly made to him by defendant.
Defendant argues that Article 775 of the Code of Criminal Procedure provides that a mistrial shall be declared when there is a legal defect in the proceeding which would make any judgment entered upon a verdict reversible as a matter of law. He contends that a legal defect occurred in the proceedings when evidence of an inculpatory statement was admitted in violation of C.Cr.P. art. 768. That articles provides that:
"If the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning of state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence."
He contends that the admission of this statement constituted prejudicial error because the jury was allowed to hear the beginning of an inculpatory statement to defendant's detriment.
The admonition to disregard the witness' statement relating what defendant told him about the money coming from Burger King was not made necessary because defendant's admission or inculpatory statement was inadmissible as an evidentiary matter. It was given rather because the state had not given proper notice of its intent to use the inculpatory oral statement at trial. Had the state intentionally solicited the testimony by direct questioning or otherwise after neglecting to give the Article 768 notice, there is no doubt that it would have violated the article. However, it is apparent that the witness' testimony was an unsolicited, unresponsive answer which the state neither intended to nor attempted to elicit.
For all of the foregoing reasons we reverse our decision expressed in the original opinion herein and now affirm the conviction of defendant Ronald Smith. Defendant's sentence is vacated and the case remanded for the imposition of sentence not inconsistent with Art. IV, Sec. 5 of the Louisiana Constitution of 1974.
TATE, J., assigns concurring reasons.
DIXON, J., dissents.
TATE, Justice (concurring).
I concur in the affirmance of the opinion; also, in the majority's finding that the district attorney's closing argument did not constitute reversible error and that a mistrial was not warranted because of a witness' brief reference to an inculpatory statement not admissible under our law. In the latter case, the admonition was sufficient to cure the defect, especially since the state promptly and properly abandoned this line of questioning.
I do not agree, however, that no error was committed in the introduction for no recognized purpose of the photograph of the victim at the morgue. The prosecution cannot introduce gruesome photographs by asking a witness (in this case, the victim's father) if the photograph figure is a certain person (here, earlier identified as the victim). The photograph must be independently admissible.
The error, however, was harmless under this particular record. The photograph, while unpleasant, was not of a grotesque *365 nature. Further, and perhaps as important, a photograph of the decedent similar to the picture in question, taken at the scene of the crime, had already been admitted in evidence. (This was not called to our attention until the application for rehearing.) The first photograph was independently admissible as a depiction of the results of the crime, and its probative value exceeded its prejudicial effect.
The crime here in question was brutal. Nevertheless, the affirmance of a conviction felt to be justified should not induce a court to announce bad law. The rights of other accused before our courts may be prejudiced if we relax traditional rules prohibiting introduction of irrelevant testimony or photographs into evidence for no other purpose than to inflame the jury.
Hard cases should not make bad law. We should not excuse the prosecution's mistake by clearing it of error, despite the sincerity of its protestations that no improper conduct was intended and that the crime was so brutal that normal rules of evidence should be overlooked.
The picture at issue was simply inadmissible, as we found in our original opinion.
Without explanation, the present majority concludes that State v. Morris, 245 La. 175, 157 So.2d 728 (1963) is distinguishable from the case before us. There, we reversed Morris' conviction because the prosecution introduced photographs taken during an autopsy of the victim's body. It was argued that the photographs were probative because they showed the victim's organs were healthy and that his death did not result from any disease thereof.
We held, however, that the photographs themselves had no probative value to that effect for a lay jury, but that instead the testimony of the medical witness as to such effect was all that was required or permitted.
The same principle applies to the present case. Here, the state alleges the photograph was probative because it showed the jury that the boy was the victim of the murder. The photograph, taken at the morgue, portrayed the body found at the scene of the murder. It was shown to the boy's father for identification.
It was the father's testimony, then, which was probative to show that his son was the victim of the homicide. The photograph did not identify the dead body. Just as in Morris, the jury itself could make no determination from the picture itself of the relevant issue. As a matter of fact, the identification of the victim was not at issue.
The majority's reasoning on this contention is erroneous.
Nevertheless, for the reasons earlier stated, I concur in the affirmance because, under the present limited circumstances, the error was harmless.
NOTES
[1] The comment is quoted more fully in the original opinion and in the dissent to the original opinion.
[2] For instances of direct reference see the leading United States Supreme Court case, Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) wherein the district attorney stated "these things [the accused] has not seen fit to take the stand and deny or explain." And State v. Hall, 297 So.2d 413 (La.1974) wherein the district attorney stated that defendant is "[t]he type of person who would jump up in a courtroom, and yell at a police officer when he hadn't even taken the stand."