SANDERS, Justice.
This is a criminal prosecution. The Grand Jury of East Baton Rouge Parish indicted'the defendant, James Graves, for the murder of Herman Adams. After trial, the jury found him guilty without capital punishment, and the trial judge sentenced him to Louisiana State Penitentiary for life. Graves appeals, relying upon five bills of exceptions.
On October 17, 1968, at approximately 4:00 p. m., the defendant, James Graves, approached several people on the corner qf North 27th-^and Fuqua Streets in Baton Rouge. Herman Adams the deceased, was sitting on the porch. James Graves had been drinking heavily and was carrying a small .22 caliber pistol. He pulled the pistol and started horseplaying with Herman Adams, shooting at his feet and in the air. The last shot fired allegedly caused Herman Adams’ death. Graves was subsequently arrested for the murder of Herman Adams.
BILL OF EXCEPTIONS NO. 8
The defendant reserved ’ this bill when' the : State was allowed to introduce from a business record information concerning the purchase of a pistol.
The defendant’s basis for this bill is that, the business record constituted hearsay, testimony because the entry was made by someone other than the State’s witness and the State made no showing that the witness had exclusive control of the records.
The witness, Mr. Dalton Bordelon, was employed as a clerk of the Acadian Hardware Store in Baton Rouge, Louisiana. He testified that when guns were sold ini his store the customer’s name, address, jihe-' type of gun and the serial number- were entered in a folder marked the “Firearms Record.” Mr. Bordelon testified that his records indicated a sale of a .22 caliber pistol to Maybell Heatley, cousin ' of-'the defendant. When he stated that the entry of the sale had been made by another employee, the defense objected and reserved Bill of Exceptions No. 8, on the basis that since the witness had not made the entry himself, the evidence was hearsay. L.S.A.R.S. 15:460 provides: ,
“Any document, other than ah aútheh-tic act, may be proved by any one Mid saw it written, or by 'a comparison'-qf' hands, or by any one who, from liis'' knowledge of the handwriting of the person alleged to have written the dodd-' ment can testify that the document prN' duced is in the handwriting of said-'pef son.” ■ ' -si ■'-.hn'
*531 Mr. Bordelon testified that he was acquainted with and he recognized the handwriting of the entry in question as that of Mr. Grady' Andrews, who was employed by Acadian Hardware at the time of the sale but who was no longer employed there.
The “Firearms Record” was a regular entry made in the course of business. The entry was made by the salesman contemporaneous with the sale. The hearsay rule does not bar the admission of such a relevant business record, when a proper foundation is laid. On appeal, great weight must be given to the ruling of the trial judge as to the sufficiency of the foundation. 23 C.J.S. Criminal Law § 851, pp. 328-331.
The trial judge properly admitted the evidence, LSA-R.S. 15 :460; State v. McCranie, 192 La. 163, 187 So. 278.
The bill' is without merit.
. BILL OF EXCEPTIONS NO. 14
The defendant reserved this bill when the trial judge allowed.a taped statement by the defendant to be offered into evidence, The defendant’s basis for this bill- is that the defendant was not properly advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The defendant maintains that he wa.s not properly advised of, his rights under the Miranda case and was not allowed an attorney after lie told the interrogating officers that he wanted to see an attorney before answering questions. Evidence was first heard by the court in the absence of the jury.
The facts relative to this issue are as follows: James Graves was arrested by Sgt. Johnson and Officer Sanders at approximately 6:00 p. m., a few hours after the shooting. Graves was taken to police headquarters and advised of his constitutional rights. Sgt. Johnson testified that when the defendant was arrested and when advised of his rights, Graves stated that he understood his rights, because he had already spoken to his attorney who explained them to him. Graves’ mother corroborated these facts when she testified that prior to her son’s arrest they had consulted an attorney in regard to the possibility of his being arrested in connection with the shooting of Herman Adams.
The Miranda warnings were read to the defendant from a standard printed form which was placed into evidence. The form indicated that Graves preferred to consult his attorney before reaching a decision about making a statement. No attempt was made to interrogate him. The officers placed him in temporary lockup and went to the hospital to wait for the autopsy. At approximately 11:00 p. m., Ben Gibbens, an investigator with the District Attorney’s .office, and Sgt. Johnson approached *533 the defendant and asked him if he wished to make a statement. Prior to making his statement, Graves indicated to Gibbens that he had been advised of his rights and that he understood what his' rights were. These facts are supported by the tape recording:
“Q. Would you state your name, your age and your address?
“A. James Graves, 2651 Grade, age 20.
“Q. James, have these officers, Sgt. Johnson, in particular, advised you of your rights ?
“A. Yeah, they have.
“Q. Do you understand what your rights are?
“A. Sure.
“Q. Are you willing at this time to make any statements concerning the death of Herman Adams?
“A. All I can tell you, I didn’t do it.”
The tape recording is merely an enlargement of the defendant’s statement that he was innocent. James Graves accounted for his whereabouts and activities during the day of the crime, and made no reference to contact with the victim. During the trial, in the presence of the jury, the defendant took the stand and gave testimony similar to the pre-trial statement.
The trial court found that the taped statement made by the defendant was freely and voluntarily given and had been made after the defendant had been fully advised of his constitutional rights. We .find no error in the ruling of the trial court.
We find that James Graves made an intelligent waiver of his right to counsel when he gave the taped statement: When Graves was first interrogated by Sgt. Johnson and Officer Sanders, he was advised of his rights and indicated that he understood them. Graves also told the, officers that he refused to sign and to waive his rights and that he preferred to speak with his attorney before making a decision. There was no more questioning by the officers ■ and the defendant was placed in a temporary lockup. Several hours later when he was removed from temporary lockup to an interrogation room and asked if he wanted to make any statements^ Graves still denied the shooting of Herman Adams but said that he would like to make a statement as to his whereabouts and his activities during the afternoon ' of the shooting. Graves was asked if he had been advised of his rights and if he understood them to which he replied in the affirmative. Graves testified as follows:
“Q. They read something to you from a pink piece of paper ?
“A. Yes.
“Q. And what was read to you?
“A. ' Something about rights, I believe.
*535 “Q. Did you tell them you understood : it?
“A. Yes, I did.
“Q. And you understand it, didn’t you?
“A. I didn’t fully understand it.
‘•Q. What didn’t you understand?
■“A. I guess I did understand it in a way.
“Q-And you told them, did you not, that you wanted to tell them that you had nothing to do with it, (didn’t you?
'•‘A. . Yes, I did. ■
“Q-And isn’t that what you told them on there? Isn’t that what you told ' them later on?
“AYes.
■•“Q. Didn’t you also tell them you wanted to tell them what you had done that day, so they could check it out?
' “A. He asked me that.
Was that part of it?
“A. Well, he asked me where I had been a part of that day.
"QDidn’t you want to tell them that?
“A. Well, I told them.
“Q. On that little pink piece of paper, didn’t they hand it to you to read yourself after they read it to you?
“A. No, they did not. They read it off.
“Q. They didn’t give it to you to read?
“A. No.
“Q. Now, you went to your lawyer with your mother earlier in the afternoon, didn’t you?
“A. Yes, I did.
“Q. Wasn’t that for the specific purpose of finding out what to do in this case?
“A. I believe so, yes, sir.”
Did James Graves waive the presence of or consultation with his counsel prior to making a statement to police officers? We find that Graves intelligently waived his right to counsel because he freely and voluntarily gave a complete exculpatory statement, consistent with the testimony he later gave on the stand. The Miranda warnings given to Graves were adequate. That he voluntarily chose to speak without the assistance of counsel provides no cause for upsetting his conviction.
In the recent case of Dillon v. United States, 391 F.2d 433 (10 Circuit, 1968), cert. denied, Duggar v. United States, 393 U.S. 889, 89 S.Ct. 208, 21 L.Ed.2d 168, the court stated:
“It is further contended by Dillon that after counsel had been retained for. him the F.B.I. agent interviewed him without *537 his counsel being present and this procedure tainted the admissions. We do not agree. The fact that Dillon’s counsel was not present at the time the admissions were confirmed does not ipso facto render them inadmissible. Butterwood v. United States, supra at 383 of 365 F.2d. The presence of counsel can be waived as well as demanded. Certainly, if an accused can waive the right to counsel when that right first attaches Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942); Leighton v. Cox, 365 F.2d 122 (10th Cir. 1966), he can waive the right to have counsel present subsequent to counsel’s appointment or retainment.”
See also Coughlan v. United States, 391 F.2d 371, (9th Circuit, 1968), cert. denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139; Reinke v. United States, 405 F.2d 228, (9th Circuit, 1968); United States v. DeLoy, 421 F.2d 900, (5th Circuit, 1970); Mayzak v. United States, 402 F.2d 152 (5th Circuit, 1968); People v. Smith, 42 Ill.2d 479, 248 N.E.2d 68; Lloyd v. State, Tenn., 440 S.W.2d 797; State v. Woods, 182 Neb. 668, 156 N.W.2d 786.
The bill is without merit.
BILL OF EXCEPTIONS NO. 15
Defendant reserved this bill of exceptions when Sgt. Johnson, a police officer, on direct examination by the State made a remark concerning the theft of a pistol. Defendant moved for a mistrial because he felt the remark was prejudicial in that it was based on hearsay evidence and inferred bad character of the defendant.
The testimony is as follows:
“Q. Did you have occasion to talk to Maybell Heatley later on ii. the investigation ?
“A. Yes, I did, the next day.
“Q. And where was that, sir?'-
“A. She came to police headquarters to report the theft of her pistol.”
Defendant maintains that this remark was reference to why the defendant had possession of the pistol and was so prejudicial that its impact couid 'not be mitigated by way of a mere admonition by the trial judge. ■ ■'
The defense admits that the remark was not responsive to the question. It is well settled that when testimony is purely gratuitous and unresponsive to the State’s question, the testimony cannot be charged against the State. State v. Callihan, 257 La. 298, 242 So.2d 521; State v. Arena, 254 La. 358, 223 So.2d 832; State v. Donaldson, 238 La. 265, 115 So.2d 345. Moreover, the trial judge admonished the jury to disregard the unresponsive remark. See LSA-C.Cr.P. Art. 771.
The bill is without merit.
*539 BILL OF EXCEPTIONS NO. 16
The defendant reserved this hill when the State attempted to introduce into evidence a partially filled box of .22 caliber ammunition and during argument over the admissibility the District Attorney made statements to the effect that he had already proved the gun and bullets were the same that were stolen from Maybell Heatley’s house. Defense moved for r mistrial based on these remarks and reserved this bill when the court denied the motion.
The remarks made - by the District Attorney and objected to by the defense are as follows:
“Mr. Gremillion: If the Court please, • I would like to offer and file in evidence this box of bullets at this time.
“Mr. Russell: I object, Your Honor. There is absolutely no foundation laid to connect these — this box of bullets to this case in any manner whatsoever. It’s completely irrelevant and immaterial. I think we could find bullets in everybody’s house.
“Mr.. Gremillion: I will submit the . question.
'“The Court: Do you want to say something about the relevancy of it, Mr. Gremillion ?
“Mr. Gremillion: Judge, we have already had the' 'bullets' — we have already had the testimony of Irvin Heatley, husband of Maybell Heatley, who said he had a box of bullets like that in his house. He didn’t know if they were still there. He said there was a gun, a .22 like that, in his house. It was shown that the .22 in question belonged to Maybell Heatley * * *
“Mr. Russell: I object, Your Honor.
“Mr. Gremillion: Came from Maybell Heatley, and I am offering this evidence —the relevancy of it, the weight of it, is for the jury to decide. The relevancy is that it is bullets for the gun we have introduced into evidence. They came from the same source as the gun did.”
We hold that the trial judge’s denial of the motion for a mistrial was correct. Prior to the introduction of these bullets, the State had previously introduced evidence to prove:
1. That Maybell Heatley had bought a small .22 pistol.
2. That the gun was normally kept under a mattress in the Heatley home.
3. The defendant at the time of the offense was living in the Heatley home.
4. The gun used in the commission of the crime was of .22 caliber.
5. The bullets sought to he introduced came from the Heatley home and' were of .22 caliber. ’ ■
*541 We find that the remarks made by the District Attorney were insufficient to warrant a mistrial. The admonition made by the trial judge to the jury was sufficient. See LSA-C.Cr.P. Art. 771.
This bill had no merit.
BILL OF EXCEPTIONS NO. 17
The defendant reserved this bill when his motion for a directed verdict was denied. The defendant maintains that the evidence presented by the State was insufficient to support a case against the defendant or to be allowed to go to the jury. Furthermore, the defendant contends that when the State’s final witness, a laboratory technician from the State Police Crime Laboratory, was called to connect the defendant with the gun which fired the fatal bullet, he referred to this case as the Herman Graves case rather than the James Graves case.
This Bill of Exceptions is insubstantial. We have held in several cases that Article 778 of the Louisiana Code of Criminal Procedure, authorizing a trial judge to direct a verdict of not guilty, is unconstitutional insofar as it applies to jury cases. State v. Williams, 258 La. 801, 248 So.2d 295 (1971) ; State v. Holmes, 258 La. 221, 245 Sc.2d 707 (1971); State v. Square, 257 La. 743, 244 So.2d 200 (1971); State v. Braxton, 257 La. 183, 241 So.2d 763 (1970); State v. Douglas, 256 La. 186, 235 So.2d 563 (1970); State v. Hudson, 253 La. 992, 221 So.2d 484 (1969). Hence, the trial judge had no authority to grant such a' motion in the present case.
For the reasons assigned, the conviction and sentence are affirmed.
BARHAM, J., dissents.